**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**
*Electronically Filed*

| | |
|---|---|
| **CHOCTAW RACING SERVICES, L.L.C.** ) | |
| ) | |
| **Plaintiff** ) | 3:070CV-237-S |
| ) | **Civil Action No.** _____ |
| **v.** ) | |
| ) | |
| **KENTUCKY HORSEMEN'S BENEVOLENT** ) | |
| **AND PROTECTIVE ASSOCIATION, INC.** ) | |
| ) | |
| **Defendant** ) | |

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff Choctaw Racing Services, L.L.C. ("Plaintiff") brings this action to enjoin Kentucky Horsemen's Benevolent and Protective Association, Inc. ("Kentucky HBPA") from its continuing violation of the antitrust laws of the United States and from tortiously interfering with Plaintiff's contractual relations with Churchill Downs Incorporated and 11 off-track betting facilities. Plaintiff also seeks damages for the harm done to its goodwill and reputation by the Kentucky HBPA's repeated defamatory statements.

### NATURE OF THE CASE

1.      Plaintiff is a tribally owned company specializing in the dissemination of off-track wagering. Plaintiff has entered into contracts with premier racetracks across the country – including Churchill Downs, Belmont and Santa Anita – to provide simulcast signals and accept wagers on races to off-track betting facilities ("OTBs"). Plaintiff provides the simulcast signals to 11 tribal casinos in Oklahoma and Wisconsin.

2.     This action stems from Plaintiff's desire to simulcast thoroughbred horse races hosted by Churchill Downs, including the running of the Kentucky Oaks (the "Oaks") and Kentucky Derby (the "Derby") on May 4 and 5, 2007.  The Derby is the most famous and prestigious thoroughbred race in the United States, and it draws the greatest betting interest of any single horse race.  Plaintiff has simulcast races hosted by Churchill Downs since at least 2000, each time with the consent of the Kentucky HBPA.

3.     However, on April 25, 2007, only 9 days before the running of the Oaks and 10 days before the running of the Derby, the Kentucky HBPA withheld its consent without warning or justification.  In doing so, the Kentucky HBPA violated Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*, and tortiously interfered with Plaintiff's contracts with Churchill Downs and the 11 OTBs.  Plaintiff seeks emergency injunctive relief to restore the status quo, and damages for the harm to its reputation caused by the Kentucky HBPA's defamatory statements about Plaintiff.

## JURISDICTION AND VENUE

4.     This action is brought pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to enjoin the Kentucky HBPA's concerted refusal to deal, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  The Kentucky HBPA's conduct has caused and will continue to cause irreparable injury to Plaintiff.  This action is also brought pursuant to the substantive law of the State of Kentucky.

5.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.  This Court has jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1332.

6.      Plaintiff's request for injunctive relief is authorized by Rule 65 of the Federal Rules of Civil Procedure; Section 16 of the Clayton Act, 15 U.S.C. § 26; and the general equitable powers of this Court.

7.      Venue is proper in this District pursuant to Sections 4(a), 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 22, and 26, and 28 U.S.C. § 1391 (b) and (c), because the Kentucky HBPA resides, transacts business, is found, or has agents in this District, and because a substantial portion of the affected interstate trade and commerce described herein is and has been carried out in this District.

8.      This Court has *in personam* jurisdiction over the Kentucky HBPA because it is a Kentucky corporation with its principal place of business in this state

## PARTIES

9.      Plaintiff Choctaw Racing Services, L.L.C. is an Oklahoma limited liability company with its principal place of business in Durant, Oklahoma.   The sole member of the limited liability company is the Choctaw Nation of Oklahoma, a federally recognized Indian Tribe.

10.      Defendant Kentucky Horsemen's Benevolent and Protective Association, Inc. ("Kentucky HBPA") is a Kentucky corporation with its principal place of business in Louisville, Kentucky.   The Kentucky HBPA is a trade association comprised of more than 6,000 owners and trainers of thoroughbred horses that race in Kentucky.   The Kentucky HBPA is an affiliate of the National Horsemen's Benevolent & Protective Association ("National HBPA").   The Kentucky HBPA purports to represent owners and trainers in negotiations with each race track in Kentucky regarding, *inter alia*, purse structure and the share of simulcast revenues.

11.    Various other persons and organizations, not named as defendants herein, have participated as co-conspirators with the Kentucky HBPA in the violations alleged herein and have performed acts and made statements in furtherance of the conspiracy.

## FACTS

12.    Plaintiff entered into a contract with Churchill Downs Incorporated to allow Plaintiff to accept pari-mutuel wagers on the thoroughbred races hosted by the track in 2007, including the Derby and Oaks.  In exchange, Plaintiff agreed to pay Churchill Downs "signal fees" consisting of a portion of the total amount of wagers Plaintiff accepted on the races (the "handle").  Plaintiff entered into similar contracts with Churchill Downs since at least 2000.  In 2006, Plaintiff paid Churchill Downs signal fees totaling approximately $180,000.

13.    The Churchill Downs Contract depends on the parties' obtaining the requisite consents under the Interstate Horseracing Act of 1978, 15 U.S.C. § 3001, *et seq.* (the "Act"). Section 5 of the Act, 15 U.S.C. § 3004, mandates that before betting can be accepted in another state on a simulcasted horserace, the consents of a number of parties must first be obtained: (a) the track that conducts the live race (the "host racing association"), (b) the racing commission having jurisdiction to regulate racing within the state where the live race occurs (the "host racing commission"), and (c) the racing commission having jurisdiction over race wagering in the state where the simulcast occurs (the "off-track racing commission").

14.    In addition, Section 5 of the Act requires that as a condition to obtaining its consent, the host racing association must also have "a written agreement with the horsemen's group."  Section 3 of the Act, 15 U.S.C. § 3002, defines the "horsemen's group" to be "the group which represents the majority of owners and trainers racing" at the horserace track.  The Kentucky HBPA purports to be the horsemen's group for Churchill Downs.

15.     Churchill Downs Incorporated, the host racing association of Churchill Downs, has consented to Plaintiff's accepting pari-mutuel wagers on races hosted by the track. Churchill Downs, in turn, has received the requisite consent from the Kentucky Horse Racing Authority, which is the relevant host racing commission. In addition, the Tribal Gaming Commissions have authorized Plaintiff to serve as a disseminator of race track signals.

16.     As of January 24, 2007, the Kentucky HBPA had consented to simulcasts by all OTB outlets except for two in Southern Indiana (the "Southern Indiana OTBs"). It has been reported that the Kentucky HBPA refuses to allow simulcasts to go to the Southern Indiana OTBs because their proximity to Kentucky racetracks has harmed Kentucky's racing industry.

17.     The Kentucky HBPA had consented to Plaintiff's simulcasting races hosted by Churchill Downs since at least 2000 through 2006. Indeed, as recently as March 9, 2007, the Kentucky HBPA consented to Plaintiff's simulcasting races hosted by another Kentucky track, Keeneland Racetrack in Lexington. Once again, the only outlets that the Kentucky HBPA vetoed with regard to Keeneland Racetrack were the Southern Indiana OTBs.

18.     In reliance on the fact that there was no reason to anticipate that the Kentucky HBPA would withhold its consent from Plaintiff in 2007, Plaintiff entered into contracts to provide simulcast signals from Churchill Downs to 11 OTBs in Oklahoma and Wisconsin.

19.     On April 25, 2007, only 9 days before the running of the Oaks and 10 days before the running of the Derby, the Kentucky HBPA notified Churchill Downs that it would not consent to Plaintiff's simulcasting the races from the track.

20.     The Kentucky HBPA's purported reason for withholding its consent is demonstrably false. The Kentucky HBPA informed Churchill Downs that it was withholding its consent because Plaintiff had not been paying any revenue to the Oklahoma Horsemen's

Benevolent and Protective Association ("Oklahoma HBPA"), another affiliate of the National HBPA. The Kentucky HBPA's Executive Director, Martin Maline ("Maline"), repeated this false accusation to the press. On April 25, 2007, the *Louisville Courier-Journal* reported that Maline stated that the Kentucky HBPA withheld its consent because Plaintiff had not been compensating Oklahoma horsemen on wagers made at the OTBs served by Plaintiff. The newspaper quoted Maline as stating "all we're saying is do it like you used to" – in other words, that Plaintiff should resume its compensation of Oklahoma horsemen.

21. The article in the *Louisville Courier-Journal* was picked up by a number of other news services. Plaintiff received numerous calls from its clients, who, upon reading this news, expressed concern about whether Plaintiff would be able to perform its contractual commitments and simulcast the Oaks and Derby. As a disseminator of horse race track signals, Plaintiff would suffer damage to its reputation and goodwill if it were unable to simulcast the Oaks and Derby.

22. In truth, Plaintiff has consistently paid the Oklahoma HBPA $5,000 each month from January 2002 through April 2007. Between January 2001 and April 2007, Plaintiff paid the Oklahoma HBPA a total of $642,501.07. From January 2001 through April 2007, Plaintiff paid nearly $3,000,000 to three horsemen's groups in connection with Oklahoma racing. The Oklahoma HBPA has not demanded that Plaintiff pay any additional amounts.

23. On the morning of Friday, April 27, 2007, Plaintiff's representative sent an e-mail to Maline to correct Maline's false statements and attempt to obtain the Kentucky HBPA's consent. The e-mail included proof of Plaintiff's payments to the Oklahoma HBPA and other horsemen's groups, including a sampling of cancelled checks and a spreadsheet showing Plaintiff's payments since 2001. The e-mail also informed Maline that the president of the Oklahoma HBPA, Joe Lucas, had acknowledged on April 25, 2007 that the Oklahoma HBPA

has been receiving its payments from Plaintiff. The e-mail requested that Maline contact Plaintiff's representative as soon as possible to confirm that the Kentucky HBPA would consent to Plaintiff's simulcasting the races from Churchill Downs.

24. Despite the obvious urgency of the situation, Maline did not respond to the e-mail until Monday, April 30, 2007. In his response, Maline asked for information that he had never previously requested – specifically, Plaintiff's payments to horse racing purses in Oklahoma, as opposed to Plaintiff's payments to various horsemen's associations.

25. On Tuesday, May 1, 2007, Plaintiff's representative sent another e-mail to Maline. The e-mail noted that Plaintiff contributes to horsemen's purses through the percentage-based signal fees it pays to the host tracks. In Oklahoma, those fee rates are approved by the state horsemen, along with the state government and the host track. The e-mail noted that the amount of the handles are generally available through public records.

26. The e-mail further noted that Plaintiff provides signals from four host tracks in Oklahoma – Blue Ribbon Downs, Fair Meadows, Will Rogers Downs, and Remington Park. Since 2006, Plaintiff has been paying Blue Ribbon Downs, Fair Meadows and Will Rogers Downs 6% of its handle from races hosted by the respective tracks. In 2006, those signal fees totaled more than $34,000. Plaintiff pays Remington Park, Oklahoma's largest track, signal fees ranging from 15% from the Choctaw Nation's OTB sites, 7.5% from the non-Choctaw OTB sites, and a 3% fee from the Wisconsin OTB site. In 2006, Plaintiff's signal fees to Remington Park totaled almost $140,000. In addition, when Remington Park was in jeopardy of closing more than 5 years ago, Plaintiff reached an agreement with the Park, the Oklahoma HBPA and the National HBPA to pay an additional flat monthly fee of $50,000, of which $40,000 per month has been paid to Remington Park, $5,000 per month has been paid directly to the

Oklahoma HBPA, and $5,000 per month has been paid to the National HBPA. These flat fees were and are <u>in addition</u> to the percentage-based signal fees that Plaintiff had been paying and continues to pay to Remington Park. All of the information provided in the May 1, 2007 e-mail is readily verifiable with the track and the HBPAs themselves.

27.     Plaintiff's representative concluded his May 1, 2007 e-mail by requesting that the Kentucky HBPA immediately consent to Plaintiff's simulcasting races from Churchill Downs, or else explain why Plaintiff's disseminator contract with Churchill Downs was not being approved and what, if anything, was needed for approval. The e-mail closed by observing that time was running out on the Churchill Downs meet and the Derby.

28.     On May 1, 2007, after Plaintiff's representative sent his e-mail to Maline, counsel for Plaintiff had a telephone conference with representatives of the Kentucky HBPA, who acknowledged that the Kentucky HBPA had withheld consent based on information in an article. The representatives of the Kentucky HBPA acknowledged that they had not conducted any investigation into the veracity of the article.

29.     As of Wednesday, May 2, 2007, just two days before the running of the Oaks and three days before the running of the Derby, Plaintiff has still withheld its consent to allow Plaintiff to simulcast races hosted by Churchill Downs.

## COUNT I:  VIOLATION OF SECTION 1 OF THE SHERMAN ACT

30.     Plaintiff incorporates the allegations contained in Paragraphs 1 through 29 as though fully set forth herein.

### Interstate Trade and Commerce

31.     The activities of the Kentucky HBPA, as described in this Complaint, were and are within the flow of and have substantially affected interstate commerce.

32.    The Kentucky HBPA's actions had and continue to have a direct, substantial and reasonably foreseeable effect on United States commerce, including causing economic harm to Plaintiff and the 11 OTB sites served by Plaintiff in Oklahoma and Wisconsin.

### Violations Alleged

33.    The Kentucky HBPA is comprised of more than 6,000 horse owners and trainers, who act as competitors and have a diversity of entrepreneurial interests.  Its refusal to give consent to allow Plaintiff to simulcast races hosted by Churchill Downs, and its refusal to articulate a valid rationale for its abrupt action, constitute a concerted refusal to deal in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

34.    Plaintiff and the Southern Indiana OTBs are the only entities from whom the Kentucky HBPA has withheld its consent to simulcast races hosted by Churchill Downs.  Unlike the Southern Indiana OTBs, whose proximity to Kentucky racetracks reportedly has harmed Kentucky's racing industry, there is no economic justification for the Kentucky HBPA to withhold consent from Plaintiff.  To the contrary, and as the Kentucky HBPA is aware, in 2006 alone, Plaintiff paid Churchill Downs signal fees totaling approximately $180,000.  Those fees are divided between the host track (Churchill Downs), the state government and the horsemen's purse fund.  Thus, by refusing to consent to Plaintiff's simulcast of races hosted by Churchill Downs, the Kentucky HBPA and its co-conspirators are operating contrary to the best economic interest of its members, in a predatory attempt to injure Plaintiff's business.

### Effects

35.    The Kentucky HBPA's concerted refusal to deal restrains trade and is injurious to competition.  As a direct and proximate result of the Kentucky HBPA's actions, Plaintiff has been and will continue to be injured and financially damaged in its business.

## COUNT II: TORTIOUS INTERFERENCE WITH CONTRACTS

36.     Plaintiff incorporates the allegations contained in Paragraphs 1 through 29 as though fully set forth herein.

37.     By withholding consent to allow Plaintiff to simulcast races hosted by Churchill Downs, the Kentucky HBPA has intentionally and improperly interfered with the Churchill Downs Contract, as well as Plaintiff's contracts with 11 OTB sites in Oklahoma and Wisconsin.

38.     Plaintiff has already sustained and will continue to suffer irreparable injury proximately caused by the Kentucky HBPA's tortious interference with Plaintiff's contracts.

39.     The Kentucky HBPA's interference with Plaintiff's contracts is malicious and wrongful, and is neither a justified privilege nor excusable.  On information and belief, the Kentucky HBPA's refusal to consent to Plaintiff's simulcast of races is motivated in large part by the personal animus of the Kentucky HBPA's Executive Director, Martin Maline, and its new President, Rick Hiles ("Hiles").  This personal animus stems from a dispute between Plaintiff and a private company operated by Maline and Hiles, Century Consultants, Inc. ("Century Consultants").

40.     More specifically, unbeknownst to Plaintiff's Board of Managers, Plaintiff's former General Manager agreed to pay Century Consultants a percentage of Plaintiff's total handle in exchange for Century Consultant's advice on simulcasting thoroughbred races. However, Plaintiff had previously entered into a ten-year contract with the National Horsemen's Administration Corporation ("NHAC"), which is affiliated with the National HBPA, to have NHAC provide the same consulting services to Plaintiff.  Century Consultants derived in excess of $100,000 in revenue from Plaintiff, which was its only client.

41.     After appointing new management, Plaintiff declared the agreement made by its former General Manager with Century Consultants to be void.  Century Consultants demanded

10

payment, but Plaintiff refused.   In May 2005, Century Consultants sued Plaintiff for alleged breach of contract.  The case was dismissed in December 2005 pursuant to a joint stipulation.

42.     The National HBPA appointed a task force to investigate whether Maline's and Hiles' roles as principals of Century Consultants created a conflict of interest with their roles as officers of the Kentucky HBPA and National HBPA.  Maline, who was the Executive Director of the Kentucky HBPA, was placed on administrative leave during the investigation.   Hiles lost re-election as the Kentucky HBPA president and was barred from serving as an officer of the NHBPA.  On November 27, 2006, Hiles was selected to serve as the Kentucky HBPA's president under a new procedure in which the president was chosen by the Kentucky HBPA's Board of Directors, instead of the general membership.

43.     With Hiles installed as the new president, the Kentucky HBPA has now withheld its consent from Plaintiff for the first time.   This represents an abrupt departure from the Kentucky HBPA's practice since at least 2000, when it consistently consented to Plaintiff's simulcast of races hosted by Churchill Downs.  The only other entities from whom the Kentucky HBPA has withheld its consent in 2007 are the two Southern Indiana OTBs, whose proximity to Kentucky racetracks reportedly has harmed Kentucky's racing industry.  By contrast, in 2006 alone, Plaintiff paid Churchill Downs signal fees totaling approximately $180,000.  Those fees are divided between the host track (Churchill Downs), the state government and the horsemen's purse fund.  On information and belief, the Kentucky HBPA's decision to withhold consent from Plaintiff was motivated by Maline's and Hiles' personal hostility to Plaintiff.

## COUNT III:  DEFAMATION

44.     Plaintiff incorporates the allegations contained in Paragraphs 1 through 29 as though fully set forth herein.

11

45.     The Kentucky HBPA's statements that Plaintiff had discontinued its payments to the Oklahoma HBPA were false and defamatory.  The statements harmed Plaintiff's reputation in the horse racing and OTB industry.  The statements were made maliciously and without any privilege.

## REQUEST FOR INJUNCTIVE RELIEF

46.     Plaintiff incorporates the allegations contained in Paragraphs 1 through 43 as though fully set forth herein.

47.     Plaintiff respectfully requests that the Court issue an order enjoining the Kentucky HBPA from withholding its consent to allow Plaintiff to simulcast races hosted by Churchill Downs.

48.     Plaintiff's request meets the standard for injunctive relief because: (a) Plaintiff has a strong likelihood of success on the merits; (b) Plaintiff will suffer irreparable injury absent an injunction; (c) granting the injunction will not cause substantial harm to others; and (d) the public interest will be served by granting Plaintiff injunctive relief.

49.     Plaintiff has a strong likelihood of success on the merits.  The facts set forth herein establish that the Kentucky HBPA engaged in a concerted refusal to deal in violation of the Sherman Act.  The Kentucky HBPA's decision to withhold consent has tortiously interfered with Plaintiff's valuable contracts and was motivated by malice.

50.     Plaintiff has suffered and will continue to suffer irreparable injury as a result of the Kentucky HBPA's wrongful acts.  The withholding of the Kentucky HBPA's consent, and the resulting inability of Plaintiff to simulcast races hosted by Churchill Downs, including the Derby, thoroughbred racing's crown jewel, has already cost Plaintiff an indeterminate amount of

revenue.  It also could place Plaintiff in breach of its contracts with the 11 OTBs it serves and will cause incalculable damage to Plaintiff's goodwill and reputation.

51.    By contrast, the issuance of an injunction will not cause harm to the Kentucky HBPA.  To the contrary, the Kentucky HBPA's decision to withhold consent will cause its members to lose their share of the handle Plaintiff otherwise would have taken in from races at Churchill Downs.  Furthermore, even if it were true, Kentucky HBPA's rationale for withholding consent – that Plaintiff discontinued payments to the Oklahoma HBPA – does not justify the Kentucky HBPA's conduct inasmuch as Plaintiff's payments to the Oklahoma HBPA do not affect Kentucky horsemen.

52.    Moreover, in the absence of an injunction, consumers who had intended to place wagers at the OTBs served by Plaintiff will be inconvenienced at best, and may be unable to place their wagers at all.  The 11 OTBs served by Plaintiff will lose inestimable revenue and goodwill.  And Churchill Downs and Kentucky horsemen will lose their share of the handle Plaintiff otherwise would have taken in from races at Churchill Downs.  Thus, the public interest will be served by granting Plaintiff injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Choctaw Racing Services, L.L.C., respectfully requests that the Court:

A.    Issue a temporary restraining order and preliminary injunction restraining the Kentucky HBPA from continuing to withhold its consent to allow Plaintiff to simulcast races hosted by Churchill Downs, including but not limited to the Derby and Oaks;

B.    Adjudge the Kentucky HBPA's refusal to deal constitutes a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

13

C.     Adjudge that the Kentucky HBPA has tortiously interfered with Plaintiff's contracts with Churchill Downs and OTB sites;

D.     Award Plaintiff damages for the harm to its reputation caused by the Kentucky HBPA's defamatory statements;

E.     Enter judgment for Plaintiff against the Kentucky HBPA;

F.     Award Plaintiff its costs of this action, including reasonable attorneys' fees; and

G.     Grant any and all other relief to which Plaintiff is entitled.

### JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all claims asserted in this Complaint so triable.

Respectfully submitted,

s/ Charles M. Pritchett, Jr.
Charles M. Pritchett, Jr.
*Counsel for Choctaw Racing Services, L.L.C.*
FROST BROWN TODD LLC
400 West Market Street, 32nd Floor
Louisville, Kentucky 40202-3363
(502) 589-5400
(502) 581-1087 *fax*
cpritchett@fbtlaw.com